IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ERIC BEVERLY, Individually, and as ) Docket No. 12 C 07234
Supervised Administrator of the )
Estate of LASHON BILBRO-BEVERLY, )
Deceased, and as Independent )
Administrator of the Estate of )
JORDAN KALEB BILBRO-BEVERLY, )

        Plaintiff,                )

            v.                    ) Chicago, Illinois
                                  ) May 9, 2016
THE UNITED STATES OF AMERICA;     ) 10:05 a.m.
NORWEGIAN AMERICAN HOSPITAL, INC.,)
an Illinois corporation; ALHIHALLI)
NAGARAJ; and EMERGENCY MEDICAL    )
SPECIALISTS, S.C., an Illinois    )
corporation,                      )

        Defendants.                )

-----------------------------------  )

THE UNITED STATES OF AMERICA,      )

        Third-Party Plaintiff,      )

            v.                    )

NORWEGIAN AMERICAN HOSPITAL, INC., )
an Illinois corporation and        )
NICOLE SZEWCZAK,                   )

        Third-Party Defendants.      )

VOLUME 14
TRANSCRIPT OF PROCEEDINGS - Trial
BEFORE THE HONORABLE JOHN ROBERT BLAKEY

```
 1   APPEARANCES:

 2
     For the Plaintiff:        BURKE, WISE, MORRISSEY & KAVENY, by
 3                             MR. BRIAN T. MONICO
                               MS. ELIZABETH A. KAVENY
 4                             161 North Clark Street
                               Suite 3250
 5                             Chicago, Illinois 60601

 6
     For the Defendant/        HON. ZACHARY T. FARDON
 7   Third-Party Plaintiff     United States Attorney, by
     The United States         MR. DOUGLAS G. SNODGRASS
 8   of America:               MR. PRASHANT KOLLURI
                               Assistant United States Attorneys
 9                             219 South Dearborn Street
                               5th Floor
10                             Chicago, Illinois 60604

11
     For the Defendants/       HALL, PRANGLE & SCHOONVELD, LLC, by
12   Third-Party Defendants    MS. SABINA BABEL
     Norwegian American        MS. MARILEE CLAUSING
13   Hospital and              200 South Wacker Drive
     Nicole Szewczak:          33rd Floor
14                             Chicago, Illinois 60606

15
     Also Present:             MR. ERIC BEVERLY
16

17

18

19

20   Court Reporter:          NANCY L. BISTANY, CSR, RPR, FCRR
                               Official Court Reporter
21                             219 South Dearborn Street, Room 1706
                               Chicago, Illinois 60604
22                             (312) 435-7626
                               nancy_bistany@ilnd.uscourts.gov
23

24

25
```

1        (Proceedings heard in open court:)

2              THE COURT:  Good morning.  Call the case.

3              THE CLERK:  12 C 7234, Beverly versus USA.

4              THE COURT:  Appearances, please.

5              MS. KAVENY:  Good morning, Your Honor.

6              Elizabeth Kaveny and Brian Monico on behalf of the

7     plaintiff, who is also present on his way over from duty at the

8     Daley Center.

9              THE COURT:  Okay.

10             MR. SNODGRASS:  Doug Snodgrass and Prashant Kolluri

11    on behalf of the United States.

12             MS. CLAUSING:  Marilee Clausing and Sabina Babel on

13    behalf of Norwegian American Hospital and Nicole Szewczak.

14             THE COURT:  Do you have an estimate when your client

15    will be here?

16             MS. KAVENY:  I don't.  Your Honor certainly doesn't

17    need to wait for him, but I did want you to know that he was on

18    his way here.

19             THE COURT:  All right.  Well, can you get an

20    estimate?  Because I would be inclined to wait for him.

21             MS. KAVENY:  Okay.

22             THE COURT:  It's not like I have another case on the

23    call today, so --

24             MS. KAVENY:  Okay.  Thank you.

25             MR. MONICO:  All right.

1       THE COURT:  We'll wait until you can get an estimate

2  when he'll be here.

3       (Brief pause.)

4       MS. KAVENY:  Your Honor, we think he's five to ten

5  minutes away.

6       THE COURT:  Okay.

7       MR. MONICO:  When he called, he was on Dearborn and

8  Madison.

9       THE COURT:  Okay.  Sounds good.  He's entitled to his

10  day in court, so I'll wait.

11       MS. KAVENY:  Thank you.

12       (Brief pause.)

13       MR. SNODGRASS:  Your Honor, one issue we have that I

14  think probably Mr. Beverly does not need to be here for --

15       THE COURT:  Okay.

16       MR. SNODGRASS:  -- is that I've been informed that

17  there is a mistake on the clerk's Rule 54 judgment form that

18  says -- the form essentially says that postjudgment interest is

19  awarded as a matter of course.

20       However, in FTCA cases, postjudgment interest is

21  awarded only to the extent authorized by 31 U.S.C. 1304 and 28

22  U.S.C. 1961.  And it's -- I've been made aware that the form is

23  incorrect and just wanted to point that out to Your Honor, and

24  hopefully we can fix that before it's entered.

25       THE COURT:  Well, that was the judgment on the jury

1    trial, right?

2          MR. SNODGRASS:  No.  That would be the judgment form

3    on the bench trial, Your Honor.

4          THE COURT:  There was no judgment entered on the

5    bench trial.

6          MR. SNODGRASS:  Correct, correct.  It hasn't been

7    entered yet.  That's why I'm letting you know about it now so

8    that --

9          THE COURT:  Oh, I thought you said that -- because we

10   entered judgment on the jury verdict.  I thought that's what

11   you were referring to.

12         MR. SNODGRASS:  No, just giving you a heads-up on

13   this, so that when you enter the judgment, you take that into

14   account.

15         THE COURT:  Well, the normal course for a case like

16   this would be to allow postjudgment interest accruing at the

17   rate and to the extent provided by law.  That's what my --

18         MR. SNODGRASS:  That -- that would cover us, Your

19   Honor.  Thank you.

20         THE COURT:  Yes.  Okay.

21      (Brief pause.)

22         THE COURT:  Off the record.

23      (Discussion off the record.)

24         THE COURT:  Are there any matters we need to address

25   before the Court makes its findings of fact and conclusions of

1  law?

2          MR. MONICO:  No, Your Honor.

3          MS. CLAUSING:  No, Your Honor.

4          MR. SNODGRASS:  No.

5          THE COURT:  In a real way, the Court is powerless to

6  right the wrong that was done on the family.  I cannot bring

7  Lashon or Jordan back to their loved ones.  Nevertheless, in

8  the law and in society, in general, we often ascribe values in

9  matters of life and death and compensate for such losses in

10 different ways on a regular basis.

11         So even though there is no simple mathematical

12 formula to quantify what is, in essence, a priceless loss, the

13 rule of law does provide for certain standards and procedures

14 for the task that the Court has before it today.

15         Accordingly, pursuant to Rule 32(a), this Court now

16 states on the record its findings of fact and conclusions of

17 law based upon the evidence at trial.

18         As supervised administrator of the estate of the

19 mother, Lashon Bilbro-Beverly, and as the independent

20 administrator of the estate of the 32-week unborn child, Jordan

21 Kaleb Bilbro-Beverly, the plaintiff, Eric Beverly, alleged that

22 the defendants, the United States of America and Norwegian

23 American Hospital, were negligent in the care provided to his

24 wife and son, resulting in their deaths at Norwegian American

25 Hospital on February 27, 2010.

1      The defendants both deny that they were negligent or
2   that they caused the death of mother or child and further deny
3   that the plaintiff suffered injuries to the extent alleged.

4      On May 5th, 2016, after nearly three weeks of trial
5   of evidence, the jury returned verdicts against both
6   defendants, including a purely advisory verdict against the
7   United States, jointly and severally, in a total amount of $9
8   million.

9      Having independently considered the evidence at trial
10  and considering the jury's advisory verdict, this Court has
11  found the United States liable for the claims alleged as
12  explained in more detail today.

13      The Court has considered the evidence at trial,
14  consisting of the testimony of the witnesses, the exhibits
15  admitted into evidence, the deposition testimony, and medical
16  literature read into the evidence per my instructions, and
17  various stipulations executed by the parties.

18      As noted at trial, this Court has not considered
19  certain evidence limited solely to the United States'
20  third-party contribution claim against Norwegian American
21  Hospital and Nicole Szewczak.  Likewise, this Court has not
22  considered certain testimony regarding the oral statement by
23  that nurse -- I believe her name was Padilla -- that was
24  subject to an objection by the United States, which in the
25  exercise of discretion, this Court excluded from the bench

1    trial portion of these proceedings.

2         So, too, the Court has not considered any notion of
3    "egregious conduct" on the part of defendants as noted in
4    closing argument at the bench trial portions of these
5    proceedings.

6         In evaluating the testimony of the witnesses, the
7    Court considered, among other things, the ability and
8    opportunity each witness had to see, hear, or know the matters
9    they related in their testimony; the witnesses' memory,
10   interests, bias, or prejudice; the witnesses' maturity,
11   intelligence, and command of the English language; the demeanor
12   and manner of each witness while testifying; and the
13   reasonableness of each witness's testimony in light of all the
14   evidence in the case, including the corroboration or lack of
15   corroboration for such testimony in the accounts of other
16   witnesses or in other portions of the evidence, such as the
17   medical records which were admitted into evidence without
18   objection.

19        Also, the Court has drawn reasonable inferences based
20   upon the evidence in the case.  And in assessing and giving
21   weight to the expert testimony presented, the Court has
22   considered the reasons given for each expert's opinion, the
23   expert's qualifications, and, once again, how such testimony
24   compares to all the other evidence in the case.

25        Additionally, the Court has, of course, held the

1    plaintiff to his burden of proof on each requisite proposition
2    by a preponderance of the evidence; and thus, the Court will
3    make its findings in due course regarding professional
4    negligence and proximate cause as required by law.

5            In light of the joint and several liability of the
6    defendants, the Court may note at certain portions of the
7    ruling today, for the purposes of context, certain findings of
8    fact as to the negligent conduct of other defendants.  But, for
9    the most part, the Court will not address those issues in any
10   detail, because, of course, the jury's verdict, their prior
11   verdict control -- verdicts control in that regard and not the
12   bench trial findings today by the Court.

13           Here the parties do not dispute and the Court finds
14   that the jurisdiction of any other court is proper.  Under
15   Federal Torts Claim Act codified under Title 28, United States
16   Code Sections 1346(b) and 267 through 2680, the defendant
17   United States can be held liable in a bench trial for tort
18   claims to the same extent as a private individual under like
19   circumstances but cannot, of course, be held liable for
20   prejudgment interest or punitive damages.

21           Suits brought under the act are governed by the "law
22   of the place where the act or omission occurred."  Here the
23   Illinois Wrongful Death Act applies, found at 740 ICLS, section
24   180, et seq.

25           Consequently, the Court finds that Dr. Raymond

1    Barajas was the agent of the defendant United States at the
2    time of the occurrence in this case.  And thus, any act or
3    omission of Dr. Barajas at that time was in law the act or
4    omission of the defendant United States.

5           In order for the plaintiff to recover then from the
6    United States, he has the burden of proving each of the
7    following propositions:  First, that the defendant acted or
8    failed to act in one or more of the ways claimed by the
9    plaintiff and then in so acting or failing to act, the
10   defendant was negligent; two, that the plaintiff was injured;
11   and, three, that the negligence of the defendant was a
12   proximate cause of the injury to the plaintiff, all in
13   accordance with *Neade versus Portes*, 193 Ill.2d 433, the 2000
14   case.

15          These elements must be proven by a preponderance of
16   the evidence, which, of course, is proof that the elements are
17   more probably true than not true.  The Court cites *Campbell*
18   *versus United States*, 904 F.2d 1188, which is a Seventh Circuit
19   case from 1990, which was quoting *Hare versus Foster G. McGaw*
20   *Hospital*, 192 Ill. App. 3d, 1031, which is a 1989 state case.

21          Alleging proximate cause, the plaintiff here claimed
22   that he was injured and sustained damage as to the deaths of
23   the mother and the child and that the defendant United States
24   of America by its agent, Dr. Barajas, was negligent in one
25   other more of the following respects:

1        Number one, that he failed to examine the mother

2    immediately or to arrange for another physician to examine her

3    immediately at 8:30 p.m. on the night in question.

4        Second, he failed to examine the mother immediately

5    or to arrange for another physician to examine her immediately

6    at 8:45 p.m. on the night in question.

7        Three, he failed to place the mother or instruct

8    others to place her in the left lateral position after the code

9    blue was initiated.

10        And four, he failed to initiate a Cesarean section

11    delivery within five minutes after the code blue.

12        Here the law requires that an obstetrician like

13    Dr. Barajas possess and use the knowledge, skill, and care

14    ordinarily used by a reasonably careful obstetrician.  Thus,

15    the failure to do something that a reasonably careful

16    obstetrician would do or the doing of something that a

17    reasonably careful obstetrician would not do under

18    circumstances similar to those shown by the evidence here

19    constitutes "professional negligence" or "deviation from the

20    standard of care."

21        For the purposes of this case, in reaching its

22    findings regarding professional negligence, the Court has

23    considered each theory of liability alleged by the plaintiff

24    and relied upon the expert testimony and the evidence of the

25    professional standards, policies, procedures, and similar

1   evidence presented at trial in accordance with *Wilbourn versus*
2   *Cavalenes*, 398 Ill. App. 3d 837, and the *Neade* case, which was
3   739 N.E.2d at 502.

4          Under the law, the allegations of proximate cause in
5   a medical malpractice case like here must be established by
6   expert testimony to "a reasonable degree of medical certainty."
7   Any causal connection between treatment or any delay in
8   treatment and the claimed injury "must not be contingent,
9   speculative, or merely possible."  The Court relying on *Walton*
10  *versus Dirkes*, D-i-r-k-e-s, 388 Ill. App. 3d 58, which is a
11  2009 case, quoting *Aguilera versus Mount Sinai Hospital Medical*
12  *Center*, 293 Ill. App. 3d 967, which is a 1997 case.

13         For example, if the injury would have occurred in the
14  absence of conduct complained of, then such conduct was not a
15  proximate cause of the injury.  That's a -- comes from the
16  *Campbell* case, 904 F.2d at 1193.

17         In short, the plaintiff must prove that it was more
18  probably true than not true that the alleged negligence was the
19  proximate cause of the claimed injuries.  Upon a proper showing
20  of negligence and proximate causation, the Illinois Wrongful
21  Death Act provides for compensation for the next of kin for the
22  pecuniary loss resulting from the loss of society of a loved
23  one.  *Ford-Sholebo versus United States*, 908 F. Supp. 2d 917,
24  which is a Northern District case of 2013.

25         In assessing damages, the Court has, therefore,

1    determined an amount of money which will reasonably and fairly
2    compensate the father, Eric Beverly, and the daughters, Amina
3    Martin, Tara Martin, Arial Patterson, Tatiana Patterson, Ashley
4    Welsh, and Taylor Beverly, for pecuniary loss, including loss
5    of society, proved by the evidence to have resulted both to the
6    widower and lineal next of kin by the death of the mother and
7    to the father and siblings by the death of the child.

8            As to the loss of society, the Court has considered
9    the mutual benefits that each family member receives from the
10   others' continued existence, including love, affection, care,
11   attention, companionship, comfort, guidance, and protection.
12   *Watson versus Shore Nursing and Rehab Center, LLC*, which is a
13   2010 case Ill. App. (1st) 103730, which was quoting additional
14   case law.

15           The Court also notes that since May 2007, Illinois
16   law permits the fact-finder to consider the grief, sorrow, and
17   mental suffering of the next of kin.  Since pecuniary loss has
18   long been defined to include the general loss of society
19   resulting from death, there is now an overlap between the proof
20   of loss of society and the proof of grief, sorrow, and mental
21   suffering, even though as a legal matter they remain distinct
22   aspects of damages calculation under Illinois law.
23   *Ford-Sholebo versus United States*, 980 F. Supp. 2d 917.

24           When, as here, a decedent leaves a husband and
25   children, the law further recognized and the Court has applied

1    a presumption that the husband and children have sustained

2    substantial pecuniary loss by reason of death.  *Ballweg versus*

3    *City of Springfield*, 114 Ill. App. -- excuse me -- Ill. 2d 107,

4    which is a 1986 case.

5         Some courts have also recognized and the Court has

6    considered that the loss of society for a minor child is

7    generally more serious than for an adult child when a decedent

8    leaves a parent, and the law further recognized the

9    presumption, which this Court has also applied, that the parent

10   has sustained some substantial pecuniary loss by reason of the

11   loss of the child's society.

12        As to the death of the mother, the Court has

13   considered what the evidence at trial showed concerning, one,

14   what instruction, moral training, and superintendents of

15   education the decedent might reasonably have been expected to

16   give her children had she lived; two, the decedent's age;

17   three, the grief, sorrow, and mental suffering of the

18   decedent's husband and children; four, the relationship between

19   the mother and her daughters; and five, the marital

20   relationship that exited between husband and wife.

21        As to the death of the child, the Court has

22   considered; one, the grief, sorrow, and mental suffering of the

23   father and siblings; and two, what the relationship was between

24   the father and siblings and at -- what it would have been with

25   the child had the child survived.

1    In its damages calculation, the Court has also
2    considered the life expectancies of the relevant individuals as
3    stipulated by the parties and the evidence of the mother's age,
4    occupation, health, habits, and activities, all as presented at
5    trial.

6    Under the law, the total amount of pecuniary loss is
7    also reduced by the expenditures the parents or the parent
8    would have been likely to incur for the child had the child
9    lived.  Here the Court has reduced that damage figure based
10   upon the stipulation of the parties regarding this expenditure
11   in the amount of $164,160.

12   Finally, as the parties concede for the purposes of
13   the bench trial, the procedure to determine non-eco damages
14   like those sought here is for the Court to "indicate the
15   reasoning process that connects the evidence to the conclusion
16   it makes" and compare damage claims with verdicts and awards in
17   similar cases, both in Illinois and elsewhere, setting forth
18   within its findings the damage award that it finds -- the
19   damage awards and how it finds them to be comparable or
20   distinct.

21   And the Court is relying, of course, on the Seventh
22   Circuit precedent, *Jutzi-Johnson versus United States*, 263 F.3d
23   753.  It's a 2001 case.  And *Arpin versus United States*, 521
24   F.3d 769, which is a 2008 case.

25   Upon consideration of the evidence, the Court finds

1  that the plaintiff has carried its burden of proof on three of

2  the four theories of professional negligence.  The Court will

3  make the findings of fact as follows:

4          On February 26th, 2010, the mother presented to the

5  emergency department of Norwegian American Hospital complaining

6  of shortness of breath and coughing.  At the time of her

7  presentation at the emergency department, the son, the unborn

8  child was 32 weeks pregnant.

9          The defendant or, actually, the doctor, who stands in

10  the shoes of the defendant United States, Dr. Barajas was a

11  physician licensed to practice in the State of Illinois and was

12  specializing in obstetrics and gynecology.

13          On that date, the mother was admitted to the general

14  medical floor of the hospital, and the doctor approved the

15  decision to admit her to the general medical floor and examined

16  her.

17          The attending physician took information regarding

18  the mother at Norwegian American Hospital, and approximately at

19  8:30 a.m. on February 27th, 2010, he examined the mother again

20  and wrote a progress note in his chart documenting his

21  examination and his evaluation.

22          His diagnosis of the mother was that she was

23  suffering from pneumonia.  He also indicated in his notes that

24  he would follow closely, which he never did.

25          Between 5:30 and 9:45 on that day, February 27, 2010,

1    the mother repeatedly communicated to Nurse Szewczak that she

2    was in distress and feeling anxious and short of breath.

3    Nicole Szewczak obtained vital signs and documented and

4    experienced and observed a decline of the mother over a period

5    of time on February 27th.

6         At 8:30 p.m. and again at 8:45 p.m., Nurse Szewczak

7    called Dr. Barajas.  There was a dispute -- and this is

8    probably one of the central disputes in the case -- regarding

9    whether or not there was one call or two phone calls.  The

10   Court finds Nurse Szewczak was credible in her testimony.  She

11   minimized and rationalized certain portions of her testimony,

12   certainly her conduct after 8:45 p.m.  But with respect to the

13   phone calls, her testimony was clear and credible.

14        The doctor, on the other hand, while the Court finds

15   that he perhaps was not testifying falsely, simply was not

16   credible because his recollection of the events was suspect.

17   He confused the two phone calls as to one phone call; and,

18   indeed, that was one of the bases of his professional

19   negligence, is that he was not following closely -- he was not

20   following the patient closely, and he did not follow the facts

21   closely.

22        Accordingly, his recollection that there was one

23   phone call rather than two is simply undermined by the evidence

24   presented at trial.

25        In light of the fact that there were two phone calls

1    and that the substance of both phone calls was detailed enough

2    to trigger an immediate response by the doctor, the Court's

3    findings -- and I'll make findings regarding professional

4    negligence in a moment -- are not difficult.  Indeed, most of

5    the experts who testified during the nearly three weeks of

6    testimony conceded on a general basis that if there were two

7    phone calls and they did contain the information that nurse

8    alleged, that it was incumbent upon the doctor to see his

9    patient immediately.

10            Despite the fact that two phone calls were made,

11   Nurse Szewczak did not follow up after that moment.  She

12   attended to her patient but essentially comforted her.  And

13   that's not what the wife needed at that moment.  She needed the

14   care and attention of a physician.  And it was incumbent upon

15   Nurse Szewczak, if Dr. Barajas did not appear, to obtain such

16   care by a physician.

17            And for her to wait from approximately 8:45 until the

18   arrest of the -- respiratory arrest of the mother and

19   ultimately cardiac arrest of the mother is not justified and

20   was a violation of the standard of care.  It was a breach and

21   proximate cause -- one of the breaches and proximate cause of

22   the death of mother and child.  But obviously, the jury's

23   verdict on that account controls and not mine.

24            At approximately 9:45, the mother was found not --

25   unresponsive.  Cardiopulmonary resuscitation was attempted, but

1   it was unsuccessful.  Later she was declared dead on February
2   27th, a little after 11:00 p.m.

3           At approximately 10:30 p.m., the baby was delivered
4   versus emergency Cesarean section.  However, the child was
5   stillborn at that point and declared dead after approximately
6   20 minutes of attempted resuscitation.

7           An autopsy results as to mother and child showed that
8   the mother's cause of death was severe bilateral acute
9   bronchopneumonia with pulmonary damage.  Jordan, obviously, as
10  conceded by the parties essentially at trial, died as the
11  proximate cause and as a result of the cardiopulmonary collapse
12  and death of the mother.

13          The doctor had a duty of care, which he violated.
14  That breach was causally connected, proximately caused the
15  damages sustained by the plaintiff in his representative and
16  personal capacity.  The standard of care was properly connected
17  causally with expert testimony.

18          Accordingly, the Court finds that Dr. Barajas was
19  professionally negligent, and that negligence was the proximate
20  cause of the damages sustained when he failed to examine the
21  mother immediately or arrange for another physician to examine
22  her immediately at 8:30 p.m.

23          He was also professionally negligent causing the
24  proximate cause of the plaintiff's damages when he failed to
25  examine the mother immediately or to arrange for another

1    physician to examine her immediately at 8:45 p.m.

2           The Court, however, finds that the failure to place

3    the mother or instruct others to place her in the left lateral

4    position after the code blue was not a proximate cause of the

5    death of mother or child.  As such, the plaintiff has failed to

6    carry its burden that that was proximately caused or that

7    the -- Dr. Barajas breached the standard of care in that

8    regard.

9           The testimony was fairly consistent that the efforts

10   at CPR were handled by multiple people during the code blue and

11   the -- indeed, from the rapid response which attended her

12   shortly before that.

13          The Court also finds that the failure to initiate a

14   Cesarean section delivery within five minutes after the code

15   blue was also a breach of the standard of care, was causally

16   connected, and proximately causally connected to the

17   plaintiff's injuries.  When -- indeed, the fact that the

18   Cesarean section was not done was one of the most difficult

19   portions of the testimony for the Court.  There was cause for

20   doing it well before the 30-plus minutes that the doctor

21   waited.

22          And when questioned by the Court, the answers by

23   Dr. Barajas were simply insufficient.  The testimony by the

24   experts, the Court found compelling, that obviously the

25   decision to make or to do an emergency C-section is a very

1  difficult one, but it's one that does require decisiveness, and

2  time is of the essence, both as to the life of the mother and,

3  of course, in the alternative, for the life of the child.

4          The Court considered the pH levels that were

5  discussed by the experts and found that evidence to be totally

6  consistent with the fact that the child was alive when

7  respiratory failure began and that the child would have had --

8  survived the encounter had a Cesarean section been timely done.

9          As a proximate cause of those three theories of

10  negligence, the mother and child were injured, and they died.

11  And Eric Beverly and his children sustained substantial

12  pecuniary injuries, including loss of money, benefits, goods,

13  and society, as the Court has already articulated.

14          Now the Court addresses the issue of damages.

15          First, the Court notes that the parties have

16  submitted comparable verdicts, and the Court incorporates those

17  by reference.  The plaintiff during the bench trial admitted

18  Exhibit 99, which listed essentially ranges of 4 million to 22

19  million for the death of mother, averaging approximately 13.4

20  million, and a series of cases ranging from 1.1 million to 19

21  million for the death of the child, averaging approximately 4.9

22  million.

23          In contrast, the United States, through the admission

24  of Exhibit 213 in the bench trial, had ranges averaging

25  approximately 4.2 million for the death of the mother and 1.4

1   million for the death of the child, for a total estimate by the
2   United States of approximately 5.6 million.

3          Those cases, the Court has reviewed those in detail.
4   Since they are part of the record, the Court need not go into
5   them in detail regarding the factual bases for each one.  The
6   Court has incorporated them by reference.

7          Suffice to say, the Court finds them similar in some
8   ways and distinct in others.  So how do the cases compare to
9   the facts established at trial, which the Court has noted, and
10  the Court has already discussed the bases and the approach it
11  has taken to the evidence at trial?

12         In essence, this case is about the living and the
13  dead.  Let me speak first to the living.

14         Certainly, the concept of grief and loss for the
15  father and his children here is assessed individually by the
16  Court, and such damages will be detailed in a moment.

17         But indicating the reasoning process that connects
18  the evidence to my conclusions, as I am required, let me say
19  this.  The Court must consider all of the facts presented at
20  trial as they exist and as the loved ones here will and have
21  experienced that grief and loss.

22         The victims of this tragedy -- and I can safely call
23  them victims even though no criminal offense has been
24  committed -- the victims do not just grieve alone.  Each does
25  so with the others, sharing in that loss and pain.  In some

1   respects, that shared grief eases the burden, and in others, it

2   intensifies the loss.  One loses not just the time he or she

3   would have spent alone with the deceased but, rather, the time

4   with the deceased in conjunction with the other loved ones.  We

5   do not live our lives alone, nor do we live on alone without a

6   wife, child, mother, or sibling.

7           So in comparing and contrasting the other cases

8   presented to this Court as potentially comparable verdicts, the

9   raw number of young victims here is more than a simple question

10  of degree, and the Court finds it constitutes a difference in

11  kind.

12          For the seven victims here, two chairs at the family

13  table will remain empty day after day, year after year, all of

14  it totaling up to several centuries worth of human suffering.

15          Let me speak now of the dead, because their story

16  places the grief and loss of the living, the relevant question

17  here, within context.

18          Lashon and Jordan came to the hospital together on

19  the brink of a brand new life together.  They came expecting

20  and deserving a minimum standard of care for a simple medical

21  condition well within the reach of modern medicine.  What they

22  found instead in the care of Dr. Barajas and the Norwegian

23  American Hospital was incompetence and death.

24          A young, vibrant, and involved mother of six, Lashon

25  leaves her husband and children in the prime of her life.  Her

1    love and encouragement gone.  Decades of sharing the blessings

2    of children and grandchildren with Eric were torn away, stolen

3    in a single night.  This Court saw that loss in the faces of

4    the witnesses.

5           For Jordan, there will be no first steps, no bedtime

6    stories, no first day of school, no first kiss, no tears washed

7    away with a father's hug, no proud glance to his sisters on

8    graduation, no wedding day, and no miraculous birth of a child

9    of his own.  What was to be his birthday, a day of joy and

10   beginning for both mother and child, became a needless tragedy

11   in which both mother and child were left to suffocate still in

12   each other's embrace.

13          For the living, who must contend with the bitter

14   consequences of the February 27, 2010, and those events, the

15   weight of what might have been will remain a terrible burden

16   that will be put upon them unjustly, unfairly, and it is a

17   burden they will carry with them the rest of their lives.

18          So as to the bench trial before this Court, it is the

19   judgment and finding of the Court that a total judgment be

20   entered in favor of plaintiff and against the United States in

21   the amount of $9 million, along with postjudgment interest

22   accruing at the rate and to the extent provided by law, and the

23   cost of the suit.  The total judgment reflects the following

24   amounts:

25          The reasonable value of the loss of society

1 experienced by husband and daughter as a result of the mother's

2 death, 900,000.

3    The reasonable value of the loss of society

4 reasonably certain to be experienced in the future by husband

5 and daughters as a result of the mother's death, 2,100,000.

6    The reasonable value of the grief, sorrow, and mental

7 suffering experienced by husband and the daughters as to the

8 result of mother's death, 900,000.

9    The reasonable value of the grief, sorrow, and mental

10 suffering reasonably certain to be experienced in the future by

11 husband and daughters as a result of mother's death, 2,100,000.

12    The reasonable value of the loss of society

13 experienced by father and siblings as a result of Jordan's

14 death, 750,000.

15    The reasonable value of the loss of society

16 reasonably certain to be experienced in the future by father

17 and sibling as a result of Jordan's death, $914,160.

18    The reasonable value of the grief, sorrow, and mental

19 suffering experienced by father and siblings as a result of

20 Jordan's death, 750,000.

21    The reasonable value of the grief, sorrow, and mental

22 suffering reasonably certain to be experienced in the future by

23 father and siblings as a result of Jordan's death, $750,000.

24    The total figure -- damage figure the Court has

25 related is reduced pursuant to the stipulation of the parties

1    regarding the expenditures in the amount of $164,160, for a

2    total of $9 million.

3           Enter judgment.  All prior dates to stand.  Court is

4    adjourned.

5        (Proceedings concluded.)

1        C E R T I F I C A T E

2

3

4               I, Nancy L. Bistany, do hereby certify that the

5    foregoing is a complete, true, and accurate transcript of the

6    Trial proceedings, Volume 14, had in the above-entitled case

7    before the HONORABLE JOHN ROBERT BLAKEY, one of the Judges of

8    said Court, at Chicago, Illinois, on May 9, 2016.

9

10   /s/ Nancy L. Bistany, CSR, RPR, FCRR          May 9, 2016

11        Official Court Reporter                   Date
         United States District Court
12       Northern District of Illinois
         Eastern Division
13

14

15

16

17

18

19

20

21

22

23

24

25